**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAVAN O'CONNOR, RAMIN PENA, JONATHAN CEPADA, SHAWN GRIFFITH, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs<br><br>                vs.<br><br>AGILANT SOLUTIONS, INC D/B/A ASI SYSTEM INTEGRATION, INC.,<br><br>              Defendant. | **Civil Action No. 1:18-cv-06937-GHW**<br><br>**ORAL ARGUMENT REQUESTED** |


### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INVALIDATE AN ARBITRATION AGREEMENT AND FOR A PROTECTIVE ORDER ENJOINING DEFENDANT FROM FURTHER IMPROPER COMMUNICATIONS

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................2

    A.    Defendant Prepared and Distributed Mandatory Arbitration Agreements While This
Litigation Was Pending Before This Court .....................................................................4

    B.    Defendant Omitted Critical Information About This Lawsuit When Distributing
Arbitration Agreements That Sought to Eliminate Putative Class and Collective
Members' Rights in This Litigation. ..............................................................................5

    C.    Defendant Presented The Arbitration Agreements As A Mandatory Condition of
Continued Employment and Pressured Field Technicians to Sign Expeditiously ..........7

LEGAL ARGUMENT ...........................................................................................................10

    I.    Legal Standard.............................................................................................................10

    II.    The Arbitration Agreements, Which Were Entered Into After Commencement of This
Litigation, Are Unconscionable And Therefore Unenforceable. ..................................11

        A.    The Arbitration Agreements Are Unconscionable Because Defendant Failed to
Disclose Material Facts About This Litigation to Class and Collective Members .....11

        B.    The Arbitration Agreements are Further Unconscionable Because They Were an
Improper Attempt to Coerce Employees Not to Participate in This Class and
Collective Action.....................................................................................................14

    III.    The Court Should Also Invalidate the Arbitration Agreements Pursuant to its
Inherent Authority to Control Improper Communications With Class and
Collective Members....................................................................................................18

    IV.    The Court Must Correct the Effects of ASI's Improper Conduct .................................20

CONCLUSION ....................................................................................................................22

# TABLE OF AUTHORITIES

CASES                                                                                                PAGE(S)

*Agerbrink v. Model Serv. LLC*,
No. 14-CV-7841, 2015 WL 6473005, at *3 (S.D.N.Y. Oct. 27, 2015)) PAGE 15, ...............15, 18

*Balasanyan v. Nordstrom, Inc.*,
No. 10-CV-2671-JM-WMC, 2012 WL 760566, at *3 (S.D. Cal. Mar. 8, 2012) .................passim

*Belt v. Emcare, Inc.*,
299 F.Supp.2d 664, 667–70 (E.D.Tex.2003) ..............................................................................21

*Billingsley v. Citi Trends, Inc.*,
560 F. App'x 914, 922 (11th Cir. 2014) .....................................................................14, 16, 17

*Billingsley v. Citi Trends, Inc.*,
948 F.Supp.2d 1287, 1292 (N.D.Ala. 2013) ..............................................................................11

*County of Santa Clara v. Astra USA, Inc.*,
No. 05-CV-3740, 2010 WL 2724512, at *3 (N.D. Cal. July 8, 2010) .......................................15

*In re Currency Conversion Fee Antitrust Litigation*,
361 F.Supp.2d 237 (S.D.N.Y. 2005) ...................................................................................passim

*E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc.*,
102 F.3d 869, 870–71 (7th Cir. 1996) .......................................................................................21

*Friedman v. Intervet Inc.*,
730 F. Supp. 2d 758, 762 (N.D. Ohio 2010) ..............................................................................15

*Griffin v. Aldi, Inc.*,
5:16-cv-0354, 2017 WL 1957021, at *4 (N.D.N.Y., 2017) ................................................15, 16

*Gulf Oil Co. v. Bernard*,
452 U.S. 89, 100 (1981). .......................................................................................................10, 19

*Hoffmann-La Roche Inc. v. Sperling*,
493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). ...........................................19, 21, 22

*Kleiner v. First Nat'l Bank of Atlanta*,
751 F.2d 1193 (11th Cir.1985) ..................................................................................................11

*Longcrier v. HL–A Co.*,
595 F.Supp.2d 1218, 1229–30 (S.D.Ala. 2008) ........................................................................21

*Mueller v. Chesapeake Bay Seafood House Assocs., LLC*,
No. CV ELH-17-1638, 2018 WL 1898557, at *8 (D. Md. Apr. 20, 2018) ................................15

*Nguyen v. Inter-Coast Int'l Training, Inc.*,
No. B270305, 2018 WL 1887347, at *18-19 (Cal. Ct. App. Apr. 20, 2018) ...............................15

*O'Connor v. Uber Technologies, Inc.*,
No. 13-cv-3826-EMC, 2013 WL 6407583, at *7 (N.D. Cal. Dec. 6, 2013) ...............................15

*Ojeda–Sanchez v. Bland Farms*,
600 F.Supp.2d 1373, 1379–81 (S.D.Ga. 2009) ...........................................................................21

*Ralph Oldsmobile v. General Motors Corp.*,
99-cv-4567, 2001 WL 1035132, at *3 (S.D.N.Y Sep. 7, 2001) ...........................................16, 21

*Rodgers v. Spar Bus. Servs., Inc.*,
No. CV G-14-055, 2015 WL 12791608, at *1 (S.D. Tex. Dec. 8, 2015) ...................................14

*Rogers v. WEBstaurant Store, Inc.*,
No. 4:18-CV-00074-JHM, 2018 WL 3058882, at *6 (W.D. Ky. June 20, 2018) .......................14

*Williams v. Securitas Security Serv. USA, Inc.*,
No. CIV.A. 10-7181, 2011 WL 2713741, at *1 (E.D.Pa.2011) ...........................................passim

## STATUTES

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216...........................................................passim

Fed. R. Civ. P. 23...............................................................................................................9, 10, 11

## OTHER AUTHORITIES

*The Manual for Complex Litigation*, Fourth (Fed. Judicial Center 2004), at §21.12, pg.
247-49 ...............................................................................................................................................18

## PRELIMINARY STATEMENT

In a brazen attempt to undermine the authority of the Court, Defendant Agilant Solutions Inc. ("ASI" or "Defendant") circumvented this Court's well recognized jurisdiction to manage counsel's contact with putative collective class members and unlawfully attempted to reduce the scope of this collective action in violation of clear legal precedent, ethical obligations and basic notions of fair play.  More specifically, with this litigation pending for over a year (including the filing of an FLSA certification motion), ASI required its employees, many of whom are putative class and collective members, to execute arbitration agreements containing class and collective action waivers and terms shortening the statute of limitations (referred to herein as the "Arbitration Agreement"). In doing so, ASI failed to (1) advise the Court and opposing counsel of their efforts; (2) advise the putative class and collective members about this lawsuit; (3) inform the putative class and collective members of the impact signing the Arbitration Agreement would have on their class and collective rights in this lawsuit; or (4) provide a clear and unambiguous opportunity to reject the Arbitration Agreement. In light of these recent revelations concerning Defendant's actions during the pendency of this litigation, Plaintiffs respectfully request this Court enter an Order declaring the Arbitration Agreement unenforceable as to the claims asserted in this litigation, issue a protective order enjoining the Defendant from further improper communications, and take any other corrective measures this Court deems just and proper.[1]

Plaintiffs' motion does not seek to invalidate or overturn federal arbitration jurisprudence. Instead, they are asking this Court for a narrow holding that these particular Arbitration Agreements should not be enforced to prevent any class or collective members from fully participating ***in this case***, which was already filed and moving toward conditional certification at

---

[1]     If Plaintiffs' motion is granted, Plaintiffs intend to move for an order shifting costs associated with the two depositions Plaintiffs needed to take in order to invalidate the arbitration agreements.

the time ASI made these unlawful efforts.  Further, Plaintiffs do not seek to invalidate the entire Arbitration Agreement; rather, only the parts that would prevent Field Technicians from joining this particular class and collective action and which would limit their statute of limitations for the claims alleged in this litigation.

As set forth in detail below, the process for implementing the Arbitration Agreements at issue here was permeated with unconscionability and therefore unenforceable. ASI, the drafting party, acted unconscionably and unlawfully when it withheld material facts regarding the class and collective members forfeiture of rights as potential plaintiffs in this litigation. Through targeted discovery ordered by this Court (*see* Dkt. No. 61), Plaintiffs learned that nowhere in the Arbitration Agreement itself, or the directives provided to class and collective members by their managers regarding signing such, was there any description of the claims that have been brought against ASI in this case. In fact, the undisputed facts make clear that the Arbitration Agreements were obtained via a campaign of misleading and coercive communications by ASI towards the class and collective members.

Moreover, even assuming the Arbitration Agreements are not *per se* unconscionable, which they are, this Court should still decline to enforce them under its broad discretionary powers to limit misleading, coercive and improper class communications. Where, as here, an employer obtains putative class members' consent to arbitration agreements which deprive class members of rights while a class action is pending by making misleading statements and material omissions, courts are permitted to take remedial action and invalidate the arbitration agreements. For the reasons set forth below, we ask that the Court do so here.

## STATEMENT OF FACTS

Plaintiffs filed this case on August 1, 2018, alleging that they, along with other similarly

situated ASI Field Technicians and other similar titles, ("FTs"), both directly or indirectly employed in New York City, were denied proper overtime wages as required by the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). *See* Dkt. No. 1. ASI answered on February 12, 2019. *See* Dkt. No. 33. Prior to the Defendant's Answer, the Court issued an Order referring the parties to a mandatory settlement conference. *See* Dkt. No. 21. The parties engaged in pre-settlement discovery exchanges and attended a settlement conference on March 13, 2019. After settlement was unsuccessful, the Court held an in-person Initial Conference with the parties on May 2, 2019. During this conference, the Court and parties' counsel discussed the claims, the collective nature of the complaint, and the prospect of Plaintiffs' conditional FLSA certification motion. The Court then set out a briefing schedule and process for proceeding with the case, which included a schedule for Plaintiffs moving for conditional certification and notice. *See* Dkt. No. 44. Both parties agreed to this process and schedule. Thereafter, in May and June 2019, the parties fully briefed the motion for conditional FLSA certification. *See* Dkt. Nos. 46-48, 50-52, 55.

While Plaintiffs' FLSA motion was pending before this Court, Plaintiffs' counsel came to learn that Defendant was engaging in improper communications with putative class and collective members, without this Court's consent, and with the specific intention of freezing participation in this litigation. Specifically, Plaintiffs' counsel was told by the Named Plaintiff Javan O'Connor that ASI was requiring current ASI employees, including all Field Technicians in New York City, to sign a contract waiving their statute of limitations and requiring mandatory individual arbitration. *See* Ex. E at ¶ 6. Immediately after learning about this, Plaintiffs' counsel filed a pre-motion conference letter seeking leave to file a motion for a protective order enjoining Defendant's actions because (1) it constituted an improper communications with putative class and collective members, and (2) interferes with this Court's jurisdiction over this case and ability to supervise

communications with putative class and collective members. *See* Dkt. No. 56. Thereafter, on September 12, 2019, this Court held a telephone conference during which it authorized expedited discovery regarding Defendant's communications with putative class and collective members. *See* Dkt. No. 61.

### A.   Defendant Prepared and Distributed Mandatory Arbitration Agreements While This Litigation Was Pending Before This Court.

Over a year into litigating this matter, ASI introduced a new dispute resolution policy in the form of the Arbitration Agreement. *See* Ex. A.  This new policy included mandatory individual arbitration terms and a waiver of the statute of limitations for all current FTs. *Id*. Based on the procedural history set forth above, it is undeniable that ASI was aware that the Plaintiffs were seeking collective status when they decided to rollout this new arbitration policy.

Specifically, in late August 2019 Defendant drafted, and then distributed for execution, a single document titled "Statue of Limitations Agreement" and "Arbitration Agreement" (collectively referred to herein as the "Arbitration Agreement"). *See* Ex. B at 144-62 (redacted emails between Ira Strum, Defendant's counsel in this litigation, and Sonny Bindra, ASI's Vice President and General Counsel, with drafts of the agreement on the morning of August 22, 2019); *see also* Ex. A. To initiate the roll out of this new policy, Mr. Bindra emailed the Arbitration Agreement to Joe Roman, an Executive Director at ASI, on Thursday, August 22, 2019 at 11:48 AM and had a phone call with him that same day, to provide direction on how to distribute the document. *See* Ex. D, Deposition of Joe Roman (referred to herein as "Roman Dep.") at 30:12-25, 33:2-35:17, 42:6-46:4, 58:15-59:15; *see also* Ex. B at 113-118 (attaching Arbitration Agreement to email titled "Technician's Agreement"). Thereafter, Mr. Roman had a phone call with his managers to "prepare to distribute the document." *Id.* at 46:8-22. During the phone call Mr. Roman explained to the managers that the document "was a new policy that was going into effect" and

"was a standard document." *Id.* at 48:20-49:22. Mr. Roman then asked the managers to "make sure these documents are signed at their meetings" and since it was a Thursday, he said he would "like everything back by Monday." *See* Roman Dep. at 50:20-25; 73:4-74:15. Thereafter, Mr. Roman emailed the managers a copy of the Arbitration Agreement for them to distribute and obtain signatures from technicians. *See* Ex. B at 13 (email sent on Thursday, August 22, 2019 at 2:02 PM stating "Here is the document" and attaching the Arbitration Agreement); *see also* Ex. C at ¶¶ 5-6; Roman Dep. at 60:20-62:8.

Based on Mr. Roman's direction, the managers then distributed the Arbitration Agreement to FTs in either the late afternoon of Thursday, August 22, 2019 or the morning of Friday, August 23, 2019 and told them they were expected to be returned executed by Monday, August 26, 2019. *See* Roman Dep. at 50:20-25, 55:3-6; *see also* Ex. B at 127 ("deadline to have it completed is by EOD Monday."); Ex. C at ¶¶ 4, 13-14. Some managers distributed the Arbitration Agreement in person during their meetings with technicians and others sent via email and requested they be signed and returned. *See e.g.* Ex. B at 24 (email from manager to technicians attaching the Arbitration Agreement and stating, "New York needs this by Monday, August 26, 2019."); Ex. B at 9 (email from manager Scott Hopkins saying "I met with my team, and a handful of techs and coordinators at Regis this morning for signatures. Only one that held out was Ronald Alonozo…"); *see also* Roman Dep. at 50:20-52:7.

### B. Defendant Omitted Critical Information About This Lawsuit When Distributing Arbitration Agreements That Sought to Eliminate Putative Class and Collective Members' Rights in This Litigation.

Although this case was pending at the time that Defendant began requiring FTs to sign the Arbitration Agreement, Defendant did not notify any class or collective members of this case or the effect that signing the Arbitration Agreement would have on their ability to vindicate their

rights in this case. *See* Ex. C at ¶¶ 7, 11, 15; *see also* Roman Dep. at 55:7-11; *see also* Ex. F, Deposition of LeVar Chambers (referred to herein as "Chambers Dep.") at 18:17-23; 33:3-19; 38: 13-19; 42:12-14. In fact, Mr. Roman did not even know himself what rights were impacted when employees signed the Arbitration Agreement. *See* Roman Dep. at 114:19-115:25. As such, during his phone call with managers preparing for the dissemination of the Arbitration Agreement there was also no mention made of this pending lawsuit. *See* Chambers Dep. at 18:17-23; 38:17-19. In fact, the managers charged with distributing the Arbitration Agreement were not even aware of the pending lawsuit themselves. *Id.* at 33: 7-19. Moreover, nothing in the Arbitration Agreement itself mentions this litigation or any rights being forfeited in this litigation by signing the Arbitration Agreement. *See* Ex. A.

Additionally, at that point in time, the FLSA collective had not yet been conditionally certified and notices had yet to be distributed to collective class members. *See* Dkt. No. 70 (granting motion for conditional FLSA certification on November 22, 2019). Plaintiffs' counsel also had not had any communications with any class or collective members except the six (6) Named and Opt-in Plaintiffs that directly reached out to Plaintiffs' counsel. *See* Davis Decl. at ¶ 3. In fact, despite having requested a class list for purposes of conducting further investigations into Plaintiffs' claims, Defendant had yet to produce any such information and was actively withholding such. *See* Dkt. No. 60 (September 20, 2019 letter motion to compel Defendant to produce "class-wide pre-certification discovery, including but not limited to, a complete class-list); *see also* Dkt. No. 68 (granting Plaintiffs' motion to compel Defendant to produce class-wide discovery).

As such, the class and collective members had no reasonable means to know about this litigation or the rights they were forfeiting in this litigation by signing the Arbitration Agreement.

### C.   Defendant Presented The Arbitration Agreements As A Mandatory Condition of Continued Employment and Pressured Field Technicians to Sign Expeditiously.

It is clear that Defendant was at all times engaged in a coercive campaign to require the FTs to sign the Arbitration Agreements as quickly as possible and for the explicit purposes of eliminating putative class members' rights in this litigation. In fact, only twenty-four (24) hours after Mr. Roman provided the Arbitration Agreements to managers for distribution and execution by FTs, Defendant's counsel in this litigation, Ira Sturm, was already seeking "feedback on the document the techs are being asked to sign." *See* Ex. B at 163. Mr. Roman than joked with Mr. Bindra that if there was "any resistance" to signing he would "give them Ira['s] home number and address." *Id.* The next business day, Monday, August 26, 2019, Mr. Roman reported to Mr. Bindra that "we are almost done getting all the signatures" and that "[t]here were a few in bklyn who hesitant to sign", which Mr. Roman posited "might be a sign" they are "waiting to join the suit or maybe not." *Id.* at 169. Two days later, by Wednesday, August 28, 2019, Mr. Roman provided another update to Mr. Bindra that, "All of the techs have signed including the few that were hesitant in Bklyn. One was on vacation and Norman [Henry] still wants time, these are the only 2 that did not sign." *Id.* at 53. The evidence makes certain that ASI was closely monitoring the progress being made in obtaining signatures from class and collective members knowing that it would effectively eviscerate such individuals' rights to participate in this pending litigation.

To further evidence the acute pressure placed upon FTs to sign the Arbitration Agreement immediately, when Norman Henry, an FT and potential plaintiff in this case, asked for 30 days to have a lawyer to review and respond to the Arbitration Agreement, Mr. Roman stated: "I don't want to give him 30 days. We could say he can't work until it's signed?" *See* Ex. B at 39.[2] The

---

[2]    Defendant's original production of emails related to ASI's communications with putative class members about the Arbitration Agreement had redacted *__all__* emails that Mr. Bindra sent, received, or was cc'ed on, regardless

response from Sonny Bindra, ASI's Vice President and General Counsel has been redacted. *Id.* at 43. The next day, after again following up on how many signatures had been collected, Mr. Roman inquired with Mr. Bindra as to how he "suggest[ed he] handle Norman?" *Id.* at 64. Mr. Bindra responded to "wait a bit" to discuss with Mr. Sturm. *Id.* at 71. Mr. Bindra then went on to question whether "Norman [Henry] is in touch with the same attorneys as the others," seemingly referring to Plaintiffs' counsel in this litigation. *Id.* While not relevant or probative, questioning whether or not Mr. Henry was in touch with our firm, which he was not, further evidences Defendant's purpose in rolling out these Arbitration Agreements: to thwart additional individuals from seeking representation from our firm or otherwise participating in this litigation. The pressure to quickly collect all FTs signatures on the Arbitration Agreement, which was undoubtedly felt by the FTs, is undeniable.

Despite any arguments to the contrary, the Arbitration Agreement was clearly a condition of continued employment. As an initial matter, the document itself is unambiguous that is it a condition of continued employment. *See* Ex. A ("In order to insure that all issues concerning your employment are dealt with in a quick and efficient manner, Agilant Solutions, Inc., and/or Technology Staffing Professionals, LLC (the "Company") ***is requiring as a condition of employment***…" and "***In consideration of my employment*** with the Company…an my receipt of the compensation, pay raises and other benefits paid to me by the Company… I agree that any

───────────────

of whether they were in fact protected attorney-client communications. Plaintiffs' submitted a pre-motion conference letter seeking to compel Defendant to produce the un-redacted email communications to or from Sonny Bindra, Vice President and General Counsel for Defendant. *See* Dkt. No. 62. After a telephone conference with Your Honor on October 31, 2019, in lieu of full briefing on this issue, Defendant agreed to re-produce the communications with most, but not all, of the redactions removed. This was one of the emails that was then produced un-redacted.

Notably, in this email when Mr. Roman learned from manager Levar Chambers that Mr. Henry was seeking 30 days to have a lawyer review the Arbitration Agreement, he testified that he told Mr. Chambers that was "fine…[a]s soon as he brought it to my attention." *See* Roman Dep. at 98:23-99:8. However, the later unredacted email contradicts this testimony. Mr. Roman did not believe that not signing was "fine," in fact, he believe it warranted suspension until he signed the Arbitration Agreement.

controversies, claims or disputes…shall be subject to binding arbitration…").  Additionally, the specific instructions provided to the managers was that "technicians were being asked to sign" the Arbitration Agreement "as part of the company's [new] policy and procedures," which technicians were required to follow or otherwise face discipline or termination. *See* Roman Dep. at 81:4-82:3. In fact, the managers were never instructed to tell technicians that they did not have to sign. *Id.* at 90:8-12.

The technicians themselves also clearly understood that the implication of not signing was that it could negatively impact their employment status with ASI. *See* Ex. E at ¶ 5.  By way of example, as of August 30, 2019, one individual, Dushan Stevich, "[r]efused to sign" because he wanted "a legal team to review" and would not "sign until they approve[d]." *Id.* at 86-89. Thereafter, on September 4, 2019, LeVar Chambers, a manager, directly reached out to Mr. Stevich offering for Mr. Roman to "answer any questions in regard to the form." *Id.* at 96. Mr. Sevich then emailed Mr. Chambers stating that "if this document is a requirement for my continued employment with Agilant Solutions, yes I would like to discuss with someone who can explain it in more detail." *Id.*  In response, Mr. Roman, who was unsure of how to respond, inquired with Mr. Bindra, "Are we saying it's a requirement?" *Id.* at 95. Apparently, between the initial roll out on August 22, 2019 and the morning of September 4, 2019, the presumption for Mr. Roman, the managers, and clearly the technicians, was that the Arbitration Agreement was a required condition of continued employment with ASI.

In fact, it was not until after this Court held a telephone conference regarding the distribution of the Arbitration Agreements, at Plaintiffs' counsels' request, that ASI advised any class or collective member that signing the Arbitration Agreement was not actually required. *See Id.* at 98 (sent at 4:04 PM on September 12, 2019); *see also* Dkt. Entry on September 4, 2019

setting telephone conference for 9/12/2019 at 11:00 AM.  In fact, it was shortly after the telephone

conference with the Court that Mr. Bindra directly asked for a manager, LeVar Chambers, to "send

Norman [Henry] an email saying that he should only sign the document if he is comfortable and

that he is not required to sign it." *Id.* at 101. Mr. Bindra then specifically directed that such email

be provided to him "as part of the production" of documents to turn over related to Defendant's

communications with putative class members, which was authorized for production by this Court

during the September 12, 2019 telephone conference that morning.  *Id.* at 101; *see also* Dkt. No.

61.  This was a clear effort by Defendant to fabricate evidence that the Arbitration Agreement was

not actually a condition of continued employment. In reality, it was only after Plaintiffs' counsel

brought these improper communications to the attention of this Court that Defendant

communicated to the only putative class member who had not yet signed the agreement[3] – Norman

Henry – that the Arbitration Agreement was not required. Mr. Chambers thereafter sent Mr. Henry

an email stating such.[4] *Id.* at 106. Notably, Mr. Henry still felt pressure to sign the agreement and

did so on September 17, 2019, just a few days later. *Id.* at 32-38.

## ARGUMENT

### I.   Legal Standard

"[A] district court has both the duty and the broad authority to exercise control over a class

action  and  to  enter  appropriate  orders  governing  the  conduct  of  counsel  and

parties." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100  (1981).  The  standard  for  circumscribing

---

[3]      Upon information and belief, the other two individuals who did not sign the agreement are based in Chicago and therefore not part of the putative class and collective in this litigation.

[4]      As set forth in Footnote 1 above, all emails with Mr. Bindra were originally redacted.  As such, in the original production of emails to Plaintiff's counsel the email between Mr. Chambers and Mr. Henry (Ex. B at 106) was produced un-redacted; however, the earlier emails whereby Mr. Bindra directs Mr. Chambers to send the email and then provide it as part of the production (Ex. B at 104-05), were not originally produced. As such, it was only after seeking Court intervention that Plaintiffs' learned that Defendant, after the September 12, 2019 telephone conference with this Court, essentially fabricated evidence that signing the Arbitration Agreements was not a requirement.

contact with putative class members requires the court is (1) presented with evidence sufficient to establish a clear record where specific findings are made; or (2) able to rely on undisputed facts, to make its ruling to limit communications between parties and potential class or collective members. *See e.g. In re Currency Conversion Fee Antitrust Litigation,* 361 F.Supp.2d 237 (S.D.N.Y.2005) (limiting post-litigation communication between parties after a record finding and undisputed facts of misleading communications); *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193 (11th Cir.1985) (limiting post-litigation communication between parties after a record finding of misleading and coercive communications); *Williams v. Securitas Security Serv. USA, Inc.,* No. CIV.A. 10-7181, 2011 WL 2713741, at *1 (E.D.Pa.2011) (same); *Billingsley v. Citi Trends, Inc.*, 948 F.Supp.2d 1287, 1292 (N.D.Ala. 2013) (same). As set forth below, there is clear record evidence and undisputed facts sufficient to allow this Court to issue an order invalidating the Arbitration Agreements obtained during post-litigation communications and to further enjoin the conduct of Defendant and Defendant's counsel by restricting all further communications that are potentially coercive or misleading.

II.    **The Arbitration Agreements, Which Were Entered Into After Commencement of This Litigation, Are Unconscionable And Therefore Unenforceable.**

      A. *The Arbitration Agreements Are Unconscionable Because Defendant Failed to Disclose Material Facts About This Litigation to Class and Collective Members.*

The undisputed facts make clear that ASI never mentioned the existence of this lawsuit to any potential class or collective members when distributing the Arbitration Agreements for execution.  As such, the Arbitration Agreements are unconscionable and unenforceable.  Courts in this Circuit have found that in the absence of candid disclosure regarding a pending litigation it is unconscionable to allow a defendant, through the implemention of an individual arbitration agreement, to nullify rights of class and collective members. *See In re Currency Conversion*, 361

F. Supp.2d at 252 (the court held arbitration clause was unconscionable where defendants possessed information regarding a class action litigation that they withheld when adding an arbitration clause to class members contracts which effectively nullified their rights in a pending litigation).

As an initial matter, the court in *In re Currency Conversion* noted that arbitration clauses are governed by contract law, and courts must "remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *In re Currency Conversion*, 361 F.Supp.2d at 250 (internal citations omitted). The court also noted that the enforceability of arbitration clauses in may be restricted or invalidated when tainted by unconscionability. *Id.* at 250. Then, relying on New York state contract law, the court found "unconscionability where a non-drafting party has no way of knowing a material fact." *Id.* at 251 (citing case law which held that a waiver of a right can only occur when the person in possession of the right has fully knowledge of the material facts). The court therefore concluded that without defendant providing information about the pending litigation there was "no reasonable manner for [the class members] to know that by failing to reject the arbitration clause, they were forfeiting their rights as potential plaintiffs in that litigation." *Id.* The court further held that defendants had ***an affirmative duty*** to inform class members of the litigation, even though no class had been certified, because the class members' rights were protected as of the date the complaint was filed. *Id.* In the absence of full disclosure of the material facts about the litigation, the court held that it would be unconscionable to allow the defendants to nullify class members' rights. *Id.* at 252.

The undisputed facts involved in the dissemination of the Arbitration Agreements here require the same well-reasoned conclusion.  ASI did not have an any arbitration policy in place

until August 22, 2019, over a year after this case was filed.  Then, beginning on the afternoon of August 22, 2019, ASI rolled out a new policy to include mandatory individual arbitration and a shortened the statutes of limitations period for all currently employed FTs. *See* Ex. C at ¶¶ 1-6; *see also* Ex. B at 13 (email to managers attaching Arbitration Agreement for distribution); Ex. A. On Thursday, August 22 and Friday, August 23, 2019, ASI had its managers distribute the Arbitration Agreements to class and collective members and required them to sign and return the agreement by no later than the following Monday, August 26, 2019. *See* Roman Dep. at 50:20-25, 55:3-6; *see also* Ex. B at 127; Ex. C at ¶¶ 13-14. Nowhere did the Arbitration Agreements mention the existence of this lawsuit. *See* Ex. A. ASI also did not themselves affirmatively inform any class or collective members that this lawsuit existed, or that signing the Arbitration Agreement would affect their rights in this lawsuit. *See* Roman Dep. at 55:7-11; *see also* Ex. C at ¶ 15. Nor did the class and collective members know about this lawsuit from Plaintiffs' counsel because neither the collective or class had been certified and therefore notices had not yet been disseminated. *See* Davis Decl. at ¶ 3; *see also* Dkt. No. 70 (Memorandum and Order granting Plaintiffs' motion for conditional FLSA certification on November 22, 2019). Plaintiffs' counsel takes seriously their obligations to avoid improper communications with class and collective members and as such has not spoken with any putative class or collective members except those who directly contacted Plaintiffs' counsel seeking to join this lawsuit.  *See* Davis Decl. at ¶ 3.  Moreover, at the time Defendants were withholding the class-list from Plaintiffs' counsel and it was not until November 6, 2019 that this Court issued an order compelling production of such for discovery and investigative purposes. *See* Dkt. No. 68. From this clear record, this Court has ample evidence to conclude that it would be unconscionable to enforce the Arbitration Agreements against the class

and collective members as to their rights to participate in this litigation since Defendant withheld

material information about this lawsuit.

>    **B.** *The Arbitration Agreements are Further Unconscionable Because They Were an Improper Attempt to Coerce Employees Not to Participate in This Class and Collective Action.*

The Arbitration Agreements are further unconscionable and unenforceable because ASI

engaged in a blitzkrieg distribution of such during the pendency of this litigation, which was clearly

an improper and coercive attempt to prevent employees from participating in this pending

litigation. An arbitration agreement is unconscionable and unenforceable when an employer

induced employees to enter the agreement in a misleading or coercive way so as to prevent them

from asserting their rights in a pending class or collective action. *See, e.g., Billingsley v. Citi*

*Trends, Inc*., 560 F. App'x 914, 922 (11th Cir. 2014) (post-lawsuit issuance of arbitration

agreements was "clearly designed to thwart unfairly the right of [employees] to make an informed

choice as to whether to participate in this FLSA collective action"); *Rodgers v. Spar Bus. Servs.*,

Inc., No. CV G-14-055, 2015 WL 12791608, at *1 (S.D. Tex. Dec. 8, 2015) (ordering collective

action notice to all potential plaintiffs, even those subject to an arbitration clause "inserted after

this case was filed," and finding that "discovery could call into question the preemptive effect of

the arbitration clause"); *Williams*, 2011 WL 2713741, at *2  (arbitration agreement constituted

improper communication where it was introduced during the pendency of litigation, the employer

did not alert putative class members of the pending litigation, and no opt-out was available);

*Balasanyan v. Nordstrom, Inc.*, No. 10-CV-2671-JM-WMC, 2012 WL 760566, at *3 (S.D. Cal.

Mar. 8, 2012) (finding a post-litigation arbitration agreement an improper communication); *Rogers*

*v. WEBstaurant Store, Inc.*, No. 4:18-CV-00074-JHM, 2018 WL 3058882, at *6 (W.D. Ky. June

20, 2018) (requiring curative notice and allowing putative collective members to participate in the

collective who were sent and signed a class and collective action waiver "without informing the putative collective class members of the pending collective action, the claims asserted against the Defendant, and the damages requested."); *Mueller v. Chesapeake Bay Seafood House Assocs., LLC*, No. CV ELH-17-1638, 2018 WL 1898557, at *8 (D. Md. Apr. 20, 2018) (requiring curative notice and opportunity to join collective action where employer issued arbitration agreement to putative class members after the filing of the lawsuit); *O'Connor v. Uber Technologies, Inc.*, No. 13-cv-3826-EMC, 2013 WL 6407583, at *7 (N.D. Cal. Dec. 6, 2013) (invalidated arbitration agreement that failed to provide drivers with notice of the pending litigation before being required to agree to an arbitration provision that would have extinguished their rights to participate in the litigation); *Nguyen v. Inter-Coast Int'l Training, Inc.*, No. B270305, 2018 WL 1887347, at *18-19 (Cal. Ct. App. Apr. 20, 2018) (finding post-lawsuit arbitration agreement "significantly unconscionable" where there was "no dispute that [defendant] did not apprise the employees at the time of signing these agreements that their rights in the class action could be affected thereby.").

Generally, communications with class members that are litigation-neutral (*i.e.* that do not alter the legal relationship between the defendants and members of a putative class) are not subject to restriction by the courts. *See Griffin v. Aldi, Inc.*, 5:16-cv-0354, 2017 WL 1957021, at *4 (N.D.N.Y., 2017). However, courts may regulate communications that are "inaccurate, unbalanced, ***misleading, or coercive, or which improperly attempt[ ] to encourage class members not to join the suit***." *Id.* (quoting *Agerbrink v. Model Serv. LLC*, No. 14-CV-7841, 2015 WL 6473005, at *3 (S.D.N.Y. Oct. 27, 2015)) (emphasis added). "[P]utative class members can be misled though omissions and failure to provide enough information." *Id.* (quoting *County of Santa Clara v. Astra USA, Inc.*, No. 05-CV-3740, 2010 WL 2724512, at *3 (N.D. Cal. July 8, 2010)); *see also Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 762 (N.D. Ohio 2010) ("A defendant's failure

to mention even an uncertified class action in securing settlements or releases from putative class members may be 'misleading.'" (collecting cases)).  Notably, employees have a "right ... to make an informed choice as to whether to participate in [an] FLSA collective action." *Billingsley*, 560 Fed.Appx. at 922.  As such, obtaining arbitration agreements that effectively eviscerated the class and collective members' rights to participate in this litigation, without even mentioning this lawsuit, is misleading, coercive and improperly discourages participation in this lawsuit.  *See Griffin*, 2017 WL 1957021, at *5.

Moreover, where there is an ongoing and unequal business or employment relationship between the parties, communications may be deemed ***inherently coercive***. *See Ralph Oldsmobile v. General Motors Corp.,* 99-cv-4567, 2001 WL 1035132, at *3 (S.D.N.Y Sep. 7, 2001) ("the danger of such coercion between employers and employees sufficient to warrant imposing restrictions regarding communication between defendants and potential class members."); *see also In re Currency Conversion,* 361 F.Supp.2d at 253   (holding arbitration clauses proffered by defendant credit card companies during litigation coercive and unenforceable where "the potential class consisted of cardholders who depended on defendants for their credit needs").

In *Billingsley*, the Eleventh Circuit upheld the district court's ruling that arbitration agreements signed after the filing of an FLSA collective action for unpaid overtime were obtained based on misleading and coercive communications and therefore unconscionable and unenforceable.  *Billingsley*, 560 F. App'x at 922.  The employer in *Billingsley* rolled out its new arbitration policy after it was served with the complaint and after the district court set a briefing schedule for plaintiff's motion for conditional certification. *Id.* The rollout of the new arbitration program was rushed, and employees were told that signing was a condition of continued employment. *Id.* Based on these facts, the district court found that the arbitration agreements were

16

an attempt to derail current employees' participation in the collective action and thus unenforceable. *Id.* The appellate court upheld this conclusion. *Id.*

The facts of this case are fundamentally the same as in *Billingsley*. ASI did not roll out its new arbitration program until August 2019, a full year after this case was filed. *Compare* Ex. C at ¶¶ 1-6, *and* Dkt. No. 1. Even more egregious then in *Billingsley*, here the Plaintiffs' motion for conditional certification was fully briefed before this Court when the Arbitration Agreements were distributed. *See* Dkt. Nos. 46-48, 50-52, 55. Moreover, as set forth above, the circumstances under which the class and collective members were required to sign the Arbitration Agreements were misleading and coercive in that they were essentially asked to sign the agreements on the spot, were given very little time to review them, understood that they were required as a condition of continued employment, and were not provided any meaningful opportunity to opt-out. *See generally*, Fact Section, s*upra*. Further, ASI did not disclose the existence of this lawsuit to the class or collective members and the Arbitration Agreement itself does not mention this lawsuit. *See* Ex. C at ¶¶ 7, 11, 15; *see also* Roman Dep. at 55:7-11; Chambers Dep. at 33:7-19; Ex. A. Indicative of the pressure to sign expeditiously, all but two (2) FTs in New York City had signed the Arbitration Agreement by Wednesday, August 28, 2019 at 7:23 AM. *See* Ex. B at 53 ("All of the techs have signed including the few that were hesitant in Bklyn. One was on vacation and Norman [Henry] still wants times, these are the only 2 that did not sign.").

By distributing the Arbitration Agreements after the lawsuit was filed and not explaining its impact on the present lawsuit, Defendant achieved its clear goal of "chilling" prospective class and collective members from being able to join this lawsuit. In fact, the email communications regarding the distribution and collection of signatures on the Arbitration Agreements undoubtedly reflect such goal. *See* Ex. B at 71 (questioning whether the reason Mr. Henry was hesitant to sign

was because he was in contact with Plaintiffs' counsel); 119 (Mr. Sturm, Defendant's counsel in this litigation seeking "feedback on the documents the techs are being asked to sign"); 120 (positing that "Techs who refuse to sign are almost certainly looking to join the suit. This should give us an idea of how many current technicians they have who are waiting"). As such, the substantial evidence supports a finding that the language of the Arbitration Agreement and the circumstances under which it was presented to putative class and collective members were a misleading and improper attempt to coerce FTs not to participate in this pending litigation, rendering it unfair, one-sided, and substantively and procedurally unconscionable.

## III. The Court Should Also Invalidate the Arbitration Agreements Pursuant to its Inherent Authority to Control Improper Communications With Class and Collective Members.

As set forth above, Defendant has engaged in unilateral coercive and misleading communications with putative class and collective members in order obtain Arbitration Agreements that were intended to be used to their detriment. Here, Defendant's communications have gone "too far," since communications with putative class and collective members must be non-coercive, accurate, and must not be an attempt to discourage participation in the pending litigation. *See Agerbrink*, 2015 WL 6473005, at *3; *see also The Manual for Complex Litigation*, Fourth (Fed. Judicial Center 2004), at §21.12, pg. 247-49, Precertification Communications with the Proposed Class, available at https://www.fjc.gov/sites/default/files/2012/mcl4.pdf (last visited on December 11, 2019). A defendant's communications with potential class members cannot be "false, misleading, or contain intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class certified under Rule 23(b)(3)." *Manual* at § 21.12, pg. 249. Thus, it has long been held that controlling communications with putative class members is within the province of the Court.

In fact, the Supreme Court has recognized that, "[b]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. at101. Courts in this circuit have affirmed the power of district courts to exercise control over communications with class members. *See In re Currency Conversion,* 361 F.Supp.2d at 252-54. This same duty was also found applicable to collective actions in *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). In particular, the benefits of the FLSA's collection action mechanism "depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id.* at 170. Because formal notice to putative FLSA collective members is provided *after* conditional certification has been approved by the district court, pre-certification, *ex parte* communication with putative FLSA collective members about the case has an inherent risk of prejudice and opportunities for impropriety. To avoid such prejudice and impropriety and to ensure the potential plaintiffs have a fair opportunity to opt-in to a FLSA collective action, the district court has the discretion to "facilitat[e] notice to potential plaintiffs" and "broad authority" to exercise control over the collective action and to govern the conduct of counsel and parties in the collective action. *See Gulf Oil,* 452 U.S. at 100 (class actions); *see also Hoffmann–La Roche,* 493 U.S. at 169–71 (affirming the power of district courts to exercise control over collective actions).

Indeed, because of the potential for abuses in collective actions, such as unapproved, misleading communications to absent class members, "the court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *See id.* at 170–71. In fact, the main purpose of the court's control over class

communication is to prevent improper contacts that could jeopardize the rights of the class members.  As such, it would defy common sense if courts could abdicate that responsibility simply because a defendant does not specifically mention the litigation in its communications with class and collective members. *See Balasanyan*, 2012 WL 760566, at *3 (relying on *In re Currency Conversion* when rejecting defendant's argument that the arbitration agreement they implemented during the course of the litigation could not be misleading because the lawsuit was never mentioned in the agreement or otherwise).

The imposition of the Arbitration Agreement combined with ASI's failure to disclose the existence of the litigation is sufficient for the court to find an improper communication. *Id.* (invalidating arbitration agreement because it was an improper communication with class and collective members); *see also In re Currency Conversion,* 361 F.Supp.2d at 252-54 (invalidated an arbitration agreement, in part, because institution of the agreement after the case had been filed constituted an improper communication with putative class members).

**IV.**       **The Court Must Correct the Effects of ASI's Improper Conduct.**

ASI's conduct undermined this Court's authority to manage the collective action and therefore, the Court has broad authority to correct the effect of ASI's misconduct, including issuing a protective order to enjoin all future communications with putative class and collective members and allowing all putative collective action members to join the lawsuit notwithstanding their coerced signing of the arbitration agreements.

Regardless of whatever right ASI may have had to ask its employees to agree to arbitrate, its efforts in August 2019 were confusing, misleading, coercive, and clearly designed to thwart unfairly the right of FT's to make an informed choice as to whether to participate in this class and collective action. Since the Arbitration Agreements by their terms will directly affect this lawsuit,

the district court has authority to prevent abuse and to enter appropriate orders governing the conduct of counsel and the parties. *See Hoffmann–La Roche,* 493 U.S. at 171. District Courts routinely exercise discretion to correct the effects of pre-certification communications with potential collective and class members after misleading, coercive, or improper communications are made. *See, e.g., Ralph Oldsmobile*, 2001 WL 1035132, at *7 (curative notice sent to members of the proposed class at the expense of defendant); *E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc.*, 102 F.3d 869, 870–71 (7th Cir. 1996) (recounting district court action to cure precertification miscommunication regarding communications between employees and employer and to require prior notice to prevent future miscommunications); *Balasanyan,* 2012 WL 760566, at *1–2, 4 (refusing to enforce individual arbitration agreement in an FLSA action because the defendant's imposition of the agreement was an improper class communication); *Williams*, 2011 WL 2713818, at *3 (invalidating arbitration agreement imposed on the defendant's employees during pre-certification stage of FLSA litigation and ordering corrective measures because the arbitration agreement was a "confusing and unfair communication" with the potential opt-in plaintiffs); *Ojeda–Sanchez v. Bland Farms,* 600 F.Supp.2d 1373, 1379–81 (S.D.Ga. 2009) (granting a limited protective order in FLSA collective action where the defendants engaged in unsupervised, unsolicited, in-person interviews of the plaintiffs in an environment that encouraged speedy and uninformed decision-making); *Longcrier v. HL–A Co.,* 595 F.Supp.2d 1218, 1229–30 (S.D.Ala. 2008) (striking declarations obtained through the defendants' abusive and misleading communications with prospective opt-in plaintiffs); *Belt v. Emcare, Inc.,* 299 F.Supp.2d 664, 667–70 (E.D.Tex.2003) (sanctioning the employer and enjoining the employer from communicating *ex parte* with potential class action members because the employer intentionally attempted to subvert

21

the district court's role in the FLSA collective action by unilaterally sending a misleading and coercive letter to potential plaintiffs that encouraged those persons not to join).

District courts' corrective actions have included refusal to enforce arbitration agreements instituted through improper means and where the timing of the execution of those agreements was similar to the post-filing, pre-certification timing in this case. *See, e.g., In re Currency Conversion,* 361 F.Supp.2d at 252–54 (imposing similar corrective action in Rule 23 class action); *see also Balasanyan,* 2012 WL 760566, at *1–2; *Williams,* 2011 WL 2713818, at *3.

These types of remedial actions are well within the considerable discretion this Court has to manage this collective and class action. That is especially true given the opt-in nature of FLSA collective actions. Because FLSA plaintiffs must opt-in, unsupervised, unilateral communications with those potential plaintiffs can sabotage the goal of the FLSA's informed consent requirement by planting the slightest seed of doubt or worry through the one-sided, unrebutted communications. Because the damage could well be irreparable, the district court must be able to exercise its discretion to attempt to correct the effects of such actions. *See Hoffmann–La Roche,* 493 U.S. at 170, 110 S.Ct. at 486 (noting that court intervention in the collective action notice process may be necessary).

## CONCLUSION

There is strong evidence that Defendants' engaged in improper communications with class and collective members such that the Arbitration Agreements must be deemed unconscionable and therefore unenforceable in this action and corrective actions should be taken to provide curative notice and to enjoin Defendant from any further improper communications.  As such this Court should grant Plaintiffs' Motion, in its entirety.

Dated: December 13, 2019
      New York, New York

Respectfully submitted,

By:     /s/

Christopher Q. Davis (CD-7282)
Rachel M. Haskell (RH-8248)
**The Law Office of Christopher Q. Davis**
80 Broad Street, Suite 703
New York, New York 10004
Telephone: (646) 430-7930
*Attorneys for Plaintiffs and the Collective and putative Class*