```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/12/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JAVAN OCONNER, individually and on behalf of :
all others similarly situated, RAMIN PENA, :
individually and on behalf of all others similarly :
situated, JONATHAN CEPADA, individually and :
on behalf of all others similarly situated, SHAWN :
GRIFFITH, EARL RASHADD, KHAZAIZAL T :
MCGANN, OBAS CLAUDENY, individually and :
on behalf of all others similarly situated, :
GONZALES ONADI, individually and on behalf of :
all others similarly situated, JANICE HAMILTON, :
individually and on behalf of all others similarly :
situated, OSMAN MATAMOROS, individually and :
on behalf of all others similarly situated, MICHAEL :
TAM, individually and on behalf of all others :
similarly situated, RAMON VELAZQUEZ, :
individually and on behalf of all others similarly :
situated, JOSHUA PAUL DAVIS, individually and :
on behalf of all others similarly situated, MUSTAFA :
LAMB, individually and on behalf of all others :
similarly situated, ALPHA MAMADOU LY, :
individually and on behalf of all others similarly :
situated, RASHISH PAUL, individually and on :
behalf of all others similarly situated, L'SHANDAR :
JONES, individually and on behalf of all others :
similarly situated, RICARDO CARVAJAL, :
individually and on behalf of all others similarly :
situated, and SALVADOR J MASSA, individually :
and on behalf of all others similarly situated, :
                                                                        :
                                                       Plaintiffs,:
                                                                        :
-v-                                                                     :
                                                                        :
AGILANT SOLUTIONS, INC., doing business as :
ASI System Integration, Inc.,                                :
                                                                        :
                                                       Defendant.:
-----------------------------------------------------------------X

1:18-cv-6937-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

     After Lead Plaintiffs in this action filed a complaint seeking certification of a collective under

the Fair Labor Standards Act ("FLSA") and a class under Federal Rule of Civil Procedure 23,

Defendant Agilant Solutions, Inc. ("ASI") rolled out a new policy under which its employees—including putative collective and class members—would be required to sign an agreement to submit claims against ASI to arbitration as a condition of their employment. Neither the agreement nor ASI management disclosed that this litigation was pending or that putative plaintiffs would forfeit their right to participate in this case by agreeing to arbitrate disputes against ASI. Evidence suggests that the purpose of the new arbitration policy rollout was to foreclose putative plaintiffs from joining this lawsuit, and ASI's counsel in this litigation was intimately involved in its introduction. Because ASI's communications with putative class and collective members were improperly coercive and misleading, Plaintiff's motion to invalidate the enforcement of the Arbitration Agreement as to putative plaintiffs in this litigation is GRANTED. Plaintiffs' motion for corrective notice is also GRANTED. However, because it is broader than necessary to protect putative plaintiffs' interest, Plaintiffs' motion for a protective order is DENIED.

## I. BACKGROUND[1]

Lead Plaintiffs were employed as Field Technicians ("FTs") either directly or indirectly by ASI. Lead Plaintiffs filed a complaint alleging breaches of New York Labor Law and the FLSA on August 1, 2018. Dkt No. 1. The complaint sought certification of an FLSA collective action and a class action pursuant to Federal Rule of Civil Procedure 23. *Id.* Lead Plaintiffs moved for conditional certification under the FLSA on May 15, 2019, Dkt No. 46. On November 22, 2019, the Court granted Lead Plaintiffs' request to conditionally certify a collective action consisting of FTs who were then employed by ASI or were previously employed for three years prior to May 15, 2019, either directly or indirectly, in New York City. *O'Conner I*, 2019 WL 6251437, at *7.

On August 22, 2019—after Plaintiffs filed their motion for conditional certification but before the Court granted it—Defendant "roll[ed] out a new policy whereby new and existing

---

[1] The Court has issued a prior opinion in this case that provides further background. *See O'Conner v. Agilant Sols., Inc.* (*O'Conner I*), No. 1:18-CV-6937-GHW, 2019 WL 6251437 (S.D.N.Y. Nov. 22, 2019).

employees would be asked to sign a document titled 'Statute of Limitations Agreement' and 'Arbitration Agreement'" (collectively, the "Arbitration Agreement").  Stipulation of Uncontested Facts ("Stipulation"), Ex. C to the Declaration of Christopher Q. Davis ("Davis Decl."), Dkt. No. 75-3, ¶ 2.  The Arbitration Agreement states:

> In consideration of my employment with the Company . . . I agree that any and all controversies, claims, or disputes . . . arising out of, relating to, or resulting from my assignment or employment with the company . . . shall be subject to binding arbitration under the Federal Arbitration Act and pursuant to New York Law.  Disputes which I agree to arbitrate, and thereby agree to waive any right to a trial by jury, include . . . claims arising under . . . [the] Fair Labor Standards Act.

Arbitration Agreement, Ex. A to Davis Decl., Dkt. No. 75-1, at 3.  The Arbitration Agreement does not mention the pendency of this litigation.

FTs were required to sign the Arbitration Agreements as a condition of continued employment with ASI.  The Statute of Limitations Agreement states that ASI "is *requiring as a condition of employment* that any claim or lawsuit relating to your service or application or service with the Company must be filed no more than twelve (12) months after the date of the employment action that is the subject of the claim or lawsuit."  *Id.* (emphasis added).  Likewise, the Arbitration Agreement states that "*[i]n consideration of my employment* with the Company . . . I agree that any and all controversies, claims, or disputes with anyone (including the Company and any employee . . .[)] shall be subject to binding arbitration."  *Id.* (emphasis added).  FTs understood that refusing to sign the Arbitration Agreement could have a negative impact on their employment relationship with ASI.  *See* Affidavit of Javan O'Connor ("O'Connor Aff."), Ex. E to Davis Decl., Dkt No. 75-5, ¶ 5.

Defendant's counsel in this litigation, Ira Sturm, was intimately involved in the rollout of the Arbitration Agreements.  Sturm apparently drafted the Arbitration Agreement and sent it to Sonny Bindra, ASI's Vice President and General Counsel.  *See* Emails, Ex. B to Davis Decl., Dkt No. 75-2, at 145-62 (redacted emails exchanging drafts of the Arbitration Agreement).  Bindra then emailed the Arbitration Agreement to Joe Roman, an Executive Director at ASI, and had a phone call with

him on the same day to explain how to distribute it to ASI managers.  Deposition of Joseph Roman ("Roman Dep."), Dkt No. 75-4, at 30:12-25; 58:18-59:7; *see also* Emails at 113-18 (email from Bindra to Roman with the subject line "Technician's Agreement" attaching the Arbitration Agreement).

None of ASI's employees explained to FTs that they would forfeit their right to participate in this pending litigation by signing the Arbitration Agreement.  Stipulation ¶ 15.  On the call during which Roman explained to managers that they were responsible for procuring FT signatures on the Arbitration Agreements, he did not mention that this litigation was pending.  *See* Deposition of LeVar Chambers ("Chambers Dep."), Dkt No. 75-6, at 18:17-23.  Indeed, Roman himself was unaware that the Arbitration Agreement might foreclose Plaintiffs from participating in this litigation.  Roman Dep. at 114:19-115:25.  Roman testified that the purpose of the call was to "prepare to distribute the document" and explain to managers that the document represented a "new policy that was going into effect."  *Id.* at 46:8-22; 48:20-49:22.  Managers were not instructed to tell FTs that they were not required to sign the Arbitration Agreement as a condition of employment.  *Id.* at 90:8-12.

Leadership at ASI insisted that the Arbitration Agreements be returned quickly.  On his call with ASI managers, Roman asked that the managers ensure that the documents were "signed at their meetings."  Roman Dep. 50:20-25.  This call took place on Thursday, August 22, 2019, and Roman asked that the managers procure signed Arbitration Agreements by the following Monday, August 26, 2019.  *Id.* at 73:4-74:9.  Roman then emailed a copy of the Arbitration Agreement to the managers for distribution to FTs.  Stipulation ¶¶ 5-6; Roman Dep. at 60:20-62:8; Emails at 13.  Subsequently, the managers distributed the Arbitration Agreements to FTs on late Thursday afternoon or Friday morning.  Stipulation at ¶¶ , 13-14; Roman Dep. at 50:20-25; *see also* Emails at 127.  Twenty-four hours after Roman provided the Arbitration Agreements to managers for distribution and execution, Bindra wrote in an email to Roman that Sturm sought "feedback on the document the techs are being asked to sign."  Emails at 163.  In response, Roman joked that if there

4

was "any resistance" to signing the Arbitration Agreement, he would "give them Ira['s] home number and address." *Id.*

Contemporaneous email evidence strongly suggests that ASI management intended the Arbitration Agreements to preclude FTs from participating in this litigation. On August 26, 2019, Roman reported to Bindra that "we are almost done getting all the signatures," although "[t]here were a few in [Brooklyn] who [were] hesitant to sign." Emails at 169. Roman noted that this "might be a sign" that the holdouts were "waiting to join" this litigation. *Id.* Two days later, on Wednesday, August 28, 2019, Roman emailed Bindra that "[a]ll of the techs have signed including the few that were hesitant in [Brooklyn]. One was on vacation and [FT] Norman [Henry] still wants time." *Id.* at 53. Roman noted that "these are the only 2 that did not sign." *Id.* When Henry requested thirty days to allow a lawyer to review and respond to the Arbitration Agreement, Roman wrote in an email to Bindra "I don't want to give him 30 days. We could say he can't work until it's signed?" Emails at 39. The next day, Roman asked Bindra how he "suggest[ed he] handle Norman?" *Id.* at 64. Bindra responded that Roman should "wait a bit" so that they could discuss with Sturm. *Id.* at 71. Bindra wondered if "Norman is in touch with the same attorneys as the others," apparently referring to Lead Plaintiffs' counsel in this litigation. *Id.*

After the Court held a telephone conference regarding Defense counsel's communications with putative class members on September 12, 2019—during which the Court authorized Plaintiffs to take expedited discovery related to ASI's communications with putative class members, *see* Dkt No. 61—ASI management abruptly changed its position and began stating that signing the Arbitration Agreement was not a condition of continued employment with ASI. Shortly after the September 12, 2019 telephone conference, Bindra asked a manager, LeVar Chambers, to "send Norman an email saying that he should only sign the document if he is comfortable and that he is not required to sign it." Emails at 101. Bindra then specifically directed that this email be provided to him "as part of the production" of documents that ASI had been directed to turn over related to

5

its communications with ASI.  *Id.*  Henry still felt pressure to sign the agreement and did so on September 17, 2019.  *Id.* at 32-38.  Hence, by September 17, 2019, all but two of Defendant's employees had signed the Arbitration Agreement.  Stipulation ¶ 18.[2]

On December 14, 2019, Plaintiffs filed this motion to invalidate the Arbitration Agreement and seeking a protective order enjoining ASI from further communications with putative plaintiffs.  Dkt. No. 74-76.  Defendants subsequently filed an opposition, Dkt. No. 79, and Plaintiffs filed a reply.  Dkt. No. 80.

## II. LEGAL STANDARD

### A. District Court's Authority Over Notice-Giving Process

Courts have "discretionary authority to oversee the notice-giving process" in an FLSA collective action.  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 174 (1989).[3]  "The court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way."  *Id.* at 170-71.  "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

"The same principles that govern communications with putative class members in a class action under Rule 23 also apply to communications with potential opt-in plaintiffs in a collective action brought under the FLSA."  *Zamboni v. Pepe W. 48th St. LLC*, No. 12 CIV. 3157 AJN JCF, 2013 WL 978935, at *2 (S.D.N.Y. Mar. 12, 2013); *see also Hoffman-La Roche Inc.*, 493 U.S. at 171

---

[2] In its Memorandum of Law in support of this motion, Dkt No. 76 ("Pl. Mem."), Plaintiffs stated that "[u]pon information and belief" the non-signing FTs "are based in Chicago and therefore not part of the putative class and collective in this litigation.  *Id.* at 10 n.3.

[3] In *Hoffman-La Roche Inc.*, the case before the Supreme Court involved a collective action under the Age Discrimination in Employment Act ("ADEA").  *Id.* at 167.  However, the ADEA "incorporates enforcement provisions of the Fair Labor Standards Act" and "provides that the ADEA shall be enforced using certain of the powers, remedies, and procedures of the FLSA," including the collective action provision of the FLSA, 29 U.S.C. § 216(b).  *Id.*  Consequently, *Hoffman-La Roche Inc.* is binding in this FLSA case.

(holding that the "same justifications" identified in *Gulf Oil* for "governing the conduct of counsel and the parties" apply in collective actions); *cf. Belt v. Emcare Inc.*, 299 F. Supp. 2d 664, 669 (E.D. Tex. 2003) (noting that because "potential class members must opt into the collective action rather than opt out as in a class action," the defendants' conduct was "more egregious" in the context of "this collective action" than it would have been in the class action context).[4]

A district court's "supervisory authority exists even before a class is certified." *Agerbrink v. Model Serv. LLC*, No. 14 CIV. 7841 JPO JCF, 2015 WL 6473005, at *3 (S.D.N.Y. Oct. 27, 2015) (collecting cases). "Indeed, the need for a district court to ensure that all parties act fairly is especially great during the early stages of FLSA litigation." *Id.* "Because formal notice to potential plaintiffs is sent only after conditional certification, 'pre-certification, *ex parte* communication with putative FLSA collective members about the case has an inherent risk of prejudice and opportunities for impropriety.'" *Id.* (quoting *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 921 (11th Cir. 2014)). "Moreover, 'because FLSA plaintiffs must opt-in, unsupervised, unilateral communications with those potential plaintiffs can sabotage the goal of the FLSA's informed consent requirement by planting the slightest seed of doubt or worry through the one-sided, unrebutted presentation of 'facts.'" *Id.* (quoting *Billingsley*, 560 F. App'x at 924) (brackets omitted).

Among the Court's managerial responsibilities in collective action cases is "the protection of class members from 'misleading communications from the parties or their counsel.'" *In re Currency Conversion*, 361 F. Supp. 2d at 252 (quoting *Erhardt v. Prudential Group*, 629 F.2d 843, 846 (2d Cir. 1980)). This duty extends to communications that threaten the "choice of remedies" available to putative plaintiffs, including collective action waivers. *Id.*; *see also Billingsley*, 560 F. App'x at 922

---

[4] The Court notes that this action has been brought as a putative class action under Federal Rule of Civil Procedure 23. *See* Second Amended Complaint, Dkt No. 31. "[P]utative class members' rights" are "protected as of the filing date of the complaint" in a class action. *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 251 (S.D.N.Y. 2005). Thus, although a class has not yet been certified in this case, precedent regarding a defendant's duty not to engage in misleading communications with putative class members is applicable here.

(holding that a district court did not abuse its discretion in allowing "putative collective action members to join the lawsuit notwithstanding their coerced signing of the arbitration agreements"); *Balasanyan v. Nordstrom, Inc.*, No. 11-cv-2609, 2012 WL 760566, at *4 (S.D. Cal. Mar. 8, 2012) (invalidating post-litigation arbitration agreements as to putative class members).

District courts can exercise their discretionary authority over the notice-giving process in collective actions to "prevent confusion and unfairness by prohibiting and correcting communication that is inaccurate, unbalanced, misleading, or coercive, or which improperly attempts to encourage class members not to join the suit." *Agerbrink*, 2015 WL 6473005, at *3 (collecting cases). "Whether a communication is misleading or coercive—and therefore warrants judicial intervention—often depends not on one particular assertion, but rather the overall message or impression left by the communication." *Id.* at *10 (citations omitted). "A court therefore must examine the context in which the communications were made and the effect of the communications' in determining whether, and how much, communication should be restricted." *Id.* (quotation omitted); *cf. In re Currency Conversion*, 361 F. Supp. 2d at 253 ("[W]hen a defendant contacts putative class members for the purpose of altering the status of a pending litigation, such communication is improper without judicial authorization.") (citing *Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994); *In re Sch. Asbestos Litig.*, 842 F.2d 671, 682 n.23 (3d Cir. 1988)).[5]

---

[5] The Court observes that in addition to courts' ability to manage the notice-giving process in a collective action, "communications with putative class members prior to certification may also implicate ethical rules." *Austen v. Catterton Partners V, LP*, 831 F. Supp. 2d 559, 569 (D. Conn. 2011); *see also Mendez v. Enecon Ne. Applied Polymer Sys., Inc.*, No. CV 14-6736 ADS AKT, 2015 WL 4249219, at *3 (E.D.N.Y. July 13, 2015) (citing ABA Formal Op. 07-445 (2007) with respect to "lawyer's ethical obligations when communicating with putative class members during the period between filing a class action lawsuit and class certification"). District courts have "authority to remedy ethical violations[.]" *Scott v. Chipotle Mexican Grill, Inc.*, No. 12-CV-08333 ALC SN, 2014 WL 4852063, at *1 (S.D.N.Y. Sept. 29, 2014) (citing *United States v. Hammad*, 858 F.2d 834, 837 (2d Cir. 1988). And "there is ample authority to support the contention that knowing participation in the efforts of a defendant to engage in improper communications with members of a class action litigation constitutes a violation of attorney ethics rules." *Cobell v. Norton*, 212 F.R.D. 14, 21 (D.D.C. 2002).

### B. Unconscionability

"[A]rbitration is a matter of contract[.]" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation omitted). Thus, "[t]he threshold question of whether the parties . . . agreed to arbitrate is determined by state contract law principles." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quotation omitted). Accordingly, courts must "remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985) (quotation omitted). Courts "apply ordinary state-law principles that govern the formation of contracts" to contractual defenses such as unconscionability. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

"When consumers are not advised of the rights they are forfeiting, enforceability of arbitration clauses may be restricted." *In re Currency Conversion*, 361 F. Supp. 2d at 250 (citing *Brookhaven Hous. Coal. v. Solomon*, 583 F.2d 584, 593 (2d Cir. 1978); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974) ("[A]n arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion.")). "This is particularly true of an adhesion contract." *Id.* "[A] contract of adhesion is a contract formed as a product of a gross inequality of bargaining power between parties." *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (quotation omitted). "A court will find adhesion only when the party seeking to rescind the contract establishes that the other party used high pressure tactics, or deceptive language, or that the contract is unconscionable." *Id.* "Adhesion contracts tainted by unconscionability are unenforceable." *In re Currency Conversion*, 361 F. Supp. 2d at 250 (citing *Brennan v. Bally Total Fitness*, 153 F. Supp. 2d 408, 416 (S.D.N.Y. 2001); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 249 (2d Cir. 1991)).

...

"A court may find unconscionability where a non-drafting party has no way of knowing a material fact." *Id.* at 251 (citations omitted). "A party acts unconscionably when it omits material information from a contract regarding the consumers' forfeiture of important protections." *Id.*

## III. DISCUSSION

### A. Enforceability of the Arbitration Agreement as to Putative Plaintiffs in this Litigation

Defendant's communications with putative plaintiffs were improper and misleading. The Arbitration Agreement did not disclose that by signing the Arbitration Agreements, putative plaintiffs would lose their right to participate in this lawsuit. ASI management made no effort to communicate this fact to its employees. And ASI management asked FTs to return the Arbitration Agreements within two business days of when they were sent to employees. Taken together, the effect of ASI's communications with its employees regarding the Arbitration Agreements was misleading and coercive. Moreover, Defense counsel in this litigation was intimately involved in the rollout of the Arbitration Agreement. That fact, and the email evidence summarized above, supports the conclusion that that ASI's management instituted its novel arbitration policy for the purpose of foreclosing plaintiffs from participating in this litigation. This evidence also suggests that ASI management instituted the new policy in bad faith, although the Court need not (and does not) make a factual finding on this issue.

The Arbitration Agreements cannot be enforced to preclude putative plaintiffs from participating in this lawsuit in these circumstances. The Court may exercise its supervisory authority to prevent the enforcement of the Arbitration Agreements to putative plaintiffs in this lawsuit. *See Agerbrink*, 2015 WL 6473005, at *10; *In re Currency Conversion*, 361 F. Supp. 2d at 253; *Balasanyan*, 2012 WL 760566, at *4; *Billingsley*, 560 F. App'x at 922. Moreover, because ASI management asked FTs to sign the Arbitration Agreements without disclosing the pendency of this litigation, the Arbitration

Agreements are unenforceable as unconscionable. *See In re Currency Conversion*, 361 F. Supp. 2d at 253.

ASI's arguments to the contrary are unpersuasive. ASI first argues that the Supreme Court's decision in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) requires that the Court enforce the Arbitration Agreements. However, *Epic Systems* does not stand for the proposition that arbitration agreements must be enforced in all circumstances, even if they have been procured in an unconscionable manner. *Epic Systems* held that, as a general matter, arbitration agreements between employers and employees must be enforced. *Id.* at 1619. However, the Supreme Court expressly noted that the employees in *Epic Systems* did not "suggest that their arbitration agreements were extracted, say, by an act of fraud or duress or in some other unconscionable way that would render any contract unenforceable." *Id.* at 1622; *see also id.* ("The [FAA's savings clause] permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.") (quotation omitted); *id.* ("The [Supreme Court has] readily acknowledged that the defense [of unconscionability] formally applied in both the litigation and the arbitration context.") (citation omitted).

Thus, *Epic Systems* does not preclude an employee from arguing that the application of an arbitration agreement would be unconscionable. And that is precisely what Plaintiffs argue in this litigation. Consequently, *Epic Systems* does not displace the authority recounted above that district courts have inherent authority to manage the notice-giving process in class or collective actions or that arbitration agreements may be unconscionable if procured through misleading or deceptive communications.

At least one district court concurs in this conclusion. In *Astarita v. Menard, Inc.*, a defendant cited *Epic Systems* to argue that it was not required to inform putative plaintiffs of the pendency of an FLSA action when it asked them to sign arbitration agreements. No. 5:17-06151-CV-RK, 2019 U.S. Dist. LEXIS 194337, at *6-8 (W.D. Mo. Nov. 8, 2019). The *Astarita* court held that *Epic Systems*

11

was "irrelevant to the issue" of whether the defendant's communications were improper because that decision "address[ed] whether the NLRA prohibits employers from enforcing class and collective action waivers, not whether and under what circumstances a corrective notice should be issued when an employer obtains a waiver while an FLSA collective action is already pending." *Id.* at *7-8. The defendant did "not contest that it imposed waivers on putative plaintiffs without giving them notice of this case, information about the effect of the waiver, or an opportunity to opt out of the waiver." *Id.* at *8. Because the communications "deprived putative plaintiffs of an opportunity to make an informed choice about whether to join this lawsuit," they were improper. *Id.* The same is true here.

ASI next argues that the question of the enforceability of arbitration clauses falls within the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). ASI's argument seems to be that because this case involves a dispute about the terms of FTs' employment, it falls within the terms of the National Labor Relations Act ("NLRA") and therefore within the NLRB's exclusive jurisdiction. In support of this novel proposition, ASI cites the decision of the National Labor Relations Board in *Cordúa Restaurants, Inc.*, 2019 WL 3842331 (N.L.R.B. Aug. 14, 2019).

ASI's argument is ill conceived. As an initial matter, "the NLRA applies only to 'labor organizations,'" traditionally labor unions. *NLRB v. Comm. of Interns & Residents*, 566 F.2d 810, 812 (2d Cir. 1977); *see also* 29 U.S.C. § 152(5) ("The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."). A private law firm representing employees in a discrimination or wage and hour case against their employer is not a "labor organization" under the NLRA, and ASI concedes that there is no precedent to the contrary. Hence, the NLRA simply does not apply to the issues before the Court.

Moreover, the NLRB does not have exclusive jurisdiction over FLSA actions. "[T]he NLRB has 'exclusive' jurisdiction only when there is an arguable violation of the NLRA." *Rest. Law Ctr. v. City of N.Y.*, 360 F. Supp. 3d 192, 223 (S.D.N.Y. 2019). Here, Plaintiffs are not arguing that ASI violated the NLRA. Rather, Plaintiffs' argument is that ASI sent out improper and misleading communications during the pendency of a collective action under the FLSA. Thus, the NLRB does not have exclusive jurisdiction over this FLSA action.

*Cordúa* does not support ASI's "exclusive jurisdiction" argument. In *Cordúa*, the NLRB held that the NLRA does not prohibit employers from promulgating mandatory collective action waivers in response to employees joining a collective action. *See Cordúa*, 2019 WL 3842331 at *3 ("[A]ny finding that the promulgation of the revised agreement violated the [NLRA] because it was in response to opt-in activity would be inconsistent with the Supreme Court's holding in *Epic Systems* that individual arbitration agreements do not violate the Act and must be enforced according to their terms."). But, again, Plaintiffs in this litigation have not alleged that ASI's actions violated the NLRA. Thus, *Cordúa* has no bearing on Plaintiffs' claims. *See Astarita*, 2019 U.S. Dist. LEXIS 194337, at *7-8 (holding that *Cordúa*, like *Epic Systems*, is "irrelevant to the issue" of whether the defendant's communications were improper because *Cordúa* "address[ed] whether the NLRA prohibits employers from enforcing class and collective action waivers, not whether and under what circumstances a corrective notice should be issued when an employer obtains a waiver while an FLSA collective action is already pending").

Moreover, nothing in the Board's decision disturbs the principle that, in FLSA litigation, district courts have the power to "prevent confusion and unfairness by prohibiting and correcting communication that is inaccurate, unbalanced, misleading, or coercive, or which improperly attempts to encourage class members not to join the suit." *Agerbrink*, 2015 WL 6473005 at *3 (citation omitted). The issue in this case is not whether Defendant promulgated the Arbitration Agreement "in response to opt-in activity." *Cordúa*, 2019 WL 3842331 at *3. Rather, the issue is

13

that Defendant promulgated the Arbitration Agreement in a manner that "pose[d] a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *Agerbrink*, 2015 WL 6473005 at *3 (quotation omitted). Hence, *Cordúa*'s persuasive value is limited in this case.

ASI further argues that the "preemption doctrine precludes the Court from addressing any claims as to the lawfulness or enforceability of the arbitration agreements which are the subject of this motion." Memorandum of Law in Opposition to Motion for Protective Order ("Def. Mem."), Dkt No. 79, at 15. This argument is nonsensical. "The federal preemption doctrine stems from the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the 'fundamental principle of the Constitution that Congress has the power to preempt state law.'" *Ulysse v. AAR Aircraft Component Servs.*, 841 F. Supp. 2d 659, 666 (E.D.N.Y. 2011) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)) (brackets omitted). "Under the Supremacy Clause of the United States Constitution, state laws that conflict with federal law are without effect, and are preempted." *N.Y.S. Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009) (quotation omitted). This is a collective action under the FLSA. The FLSA is a federal statute. Hence, it does not make sense to argue that this action is preempted by the NLRA.

ASI's "exclusive jurisdiction" and "preemption" arguments would have radical consequences if accepted. If any dispute between an employer and employee falls within the exclusive jurisdiction of the NLRB, then federal courts lack jurisdiction to adjudicate such disputes under other federal laws, such as Title VII of the 1964 Civil Rights Act or the Equal Pay Act. Similarly, if ASI's arguments are correct, the same logic would suggest that these well-established federal laws are preempted by the NLRA. Neither of these conclusions is supported by logic or precedent, and the Court will not accept them.

ASI also argues that Plaintiffs are barred from seeking equitable relief because they stipulated to withdraw their claims for injunctive relief from the First Amended Complaint. Def. Mem. at 5-8.

14

ASI misconstrues the nature of the stipulation between the parties.  Plaintiffs agreed merely to "amend their complaint to remove any claims for injunctive relief."  Stipulation and Order, Dkt No. 29, ¶ 1.  Plaintiffs have abided by the terms of that stipulation; they do not seek injunctive relief as a remedy for ASI's alleged violations of the FLSA.  Rather, Plaintiffs seek injunctive relief to ensure that putative plaintiffs are able to pursue their FLSA claims.  In any event, Plaintiffs' Second Amended Complaint contains a request for "such other and further relief, in law *or equity*, as this Court may deem appropriate and just."  Dkt No. 31, at 29 (emphasis added).  And Plaintiffs' stipulation was not with prejudice to bringing a claim for injunctive relief in the future; it was merely an agreement to withdraw the claims for injunctive relief from in the Amended Complaint.  *See* Stipulation and Order ¶ 2.  Thus, the parties' stipulation does not preclude the Court from granting corrective notice in this case.

        Defendant's remaining arguments are likewise without merit.  Defendant argues that Plaintiffs lack standing to seek equitable relief because, according to Defendant, that power is reserved to the exclusive authority of the Secretary of Labor.  But Plaintiffs are not seeking injunctive relief under the FLSA; rather, Plaintiffs invoke the Court's inherent authority to prevent Defendant from engaging in communications that have the effect of eliminating their right to participate in this lawsuit.  As noted above, there is ample precedent supporting a district court's authority, and duty, to perform that function.  And requiring ASI's communications not to be misleading or coercive does not violate its First Amendment rights.  The Court is not ordering ASI to say anything.  But if ASI chooses to contact putative plaintiffs, it must do so in a manner that is not coercive or misleading.  An order to this effect does not violate ASI's First Amendment rights.  Moreover, the sole case relied upon by Defendant in support of its argument that Plaintiffs' requested relief violates its First Amendment rights, *Nat'l Ass'n of Mfrs. v. N.L.R.B.*, 717 F.3d 947 (D.C. Cir. 2013), has been overruled.  *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014).

Accordingly, the Court holds that the Arbitration Agreement is not enforceable against putative plaintiffs in this action. The Court's holding is narrow. The Court does not rule on the Arbitration Agreement's viability as to Defendant's other employees, nor on its preclusive effect upon other potential collective actions. The Court's ruling is limited to putative members of this FLSA collective action and is thus squarely within its "discretionary authority to oversee the notice-giving process." *Hoffmann-La Roche Inc.*, 493 U.S. at 174. The Court also grants Plaintiffs' request to issue corrective notice apprising putative plaintiffs of their right to join this lawsuit.

### B. Protective Order

In addition to their request that the Arbitration Agreement be held unenforceable against putative plaintiffs in this action, Plaintiffs seek a protective order "to enjoin all future communications with putative class and collective members." Pl. Mem. at 20. Orders restricting communications must be "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co.*, 452 U.S. at 101. A court "must examine the context in which the communications were made and the effect of the communications in determining whether, and how much, communication should be restricted." *Agerbrink*, 2015 WL 6473005 at *10 (quotation omitted). Courts have found abusive communications warranting such an order to include communications that affect class members' decisions regarding whether to participate in the litigation. *See, e.g.*, *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1203 (11th Cir. 1985) (prohibiting further communications where Defendant's attempts to obtain opt-outs from putative class members "constituted an intolerable affront to the authority of the district court to police class member contact"); *Romano v. SLS Residential, Inc.*, 253 F.R.D. 292, 299 (S.D.N.Y. 2008) (prohibiting Defendant from contacting any potential plaintiffs or their family members regarding the lawsuit, but recognizing that, as to those putative class members still residing in defendants' facility, "the [d]efendants of course may have contact with them to the extent that they must continue to provide services to whoever is in their care"). However, a court must

16

consider the rights of the parties under the circumstances in order to identify "the narrowest possible relief which would protect the respective parties." *Gulf Oil Co.*, 452 U.S. at 102.

Though Defendant's communications with putative collective action members warrant correction, Plaintiffs' proposed relief is not the narrowest possible relief that will protect the parties. At least some of the putative collective action members at issue are employed by ASI, making an outright prohibition on communication unrealistic and unnecessary. Moreover, Defendant's improper communications with putative collective action members were limited to the Arbitration Agreement, which the Court has ruled cannot be enforced against putative plaintiffs in this action. Given that holding, the Court finds it unnecessary to enter a protective order at this time. *See Agerbrink*, 2015 WL 6473005 at *11 (declining to enter a protective order preventing all future communications with putative collective members as "overly broad and overreaching").

**IV. CONCLUSION**

The Arbitration Agreement is unenforceable against putative plaintiffs to preclude their participation in this litigation. However, the Court will not issue a protective order enjoining all future communications with putative collective action members. Accordingly, Plaintiffs' motion GRANTED in part and DENIED in part.

The Court will hold a telephone conference to discuss Plaintiffs' proposed corrective notice on March 16, 2020 at 4 p.m. The parties are directed to call Chambers (212-805-0296) at that time with all parties on the line.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 74.

SO ORDERED.

Dated: March 12, 2020  
New York, New York

_____  
GREGORY N. WOODS  
United States District Judge